David F. Lee, Jr., J.
The defendant Board of Supervisors moves “for an Order approving a reapportionment of the Board of Supervisors of Chenango County” as provided in Local Law No. 1 of the Local Laws of 1969 of Chenango County. The plan submitted has been approved “as a temporary and interim plan of apportionment.” The court is called upon to determine whether the weighted voting plan meets the constitutional standards laid down by the United States Supreme Court in Gray v. Sanders (372 U. S. 368); Reynolds v. Sims (377 U. S. 533); and Avery v. Midland County (390 U. S. 474), cited by this court in the decision of December 5, 1968 on plaintiff’s motion for summary judgment.
The constitutionality of the weighted voting plan submitted depends on how closely it approximates the ideal of giving each resident of the county equality of representation in the Board of Supervisors; on whether it complies with the principle of “ one person, one vote.” Under such a weighted voting plan each legislator is entitled to a number of votes proportional to the population of the represented district, and where the discrepancies in voting power are not extreme the constitutional requirements are met.
*930 1 ‘ Ideally, in any weighted voting plan, it should be mathematically possible for every member of the legislative body to cast the decisive vote on legislation in the same ratio which the population of his constituency bears to the total population. * * * A legislator’s voting power, measured by the mathematical possibility of his casting a decisive vote, must approximate the power he would have in a legislative body which did not employ weighted voting.
* *
In order to measure the mathematical voting power of each member of these county boards of supervisors and compare it with the proportion of the population which he represents, it would be necessary to have the opinions of experts based on computer analyses.” (Iannucci v. Board of Supervisors of County of Washington, 20 N Y 2d 244, 252, 253.)
The testimony of an expert concerning the proposed plan, based on computer analysis, and the opinions of the expert have been presented on a hearing in this matter. The expert, Lee Papayanopoulos, testified on direct examination, in part:
“ Q. Now, sir, with respect to the weighting of each of the supervisor’s votes with the Chenango County reapportionment plan, are these votes as determined from your program analysis in proportion to the number of times that legislator can effect the outcome of legislation as compared to the population that that legislator represents. A. The votes are as shown here plus, in effect, which I mentioned before, which is the voting power which is in proportion as you described.
‘1 Q. Can voting power be stated to mean the number of times that a particular legislator could affect the outcome of legislation? A. That is a definition of voting power.
“ Q,. That is a definition of voting power. Then in other words, this program with deviations 1.4 plus, and minus 2.04 plus, indicates that each legislator has a number of votes substantially in proportion to the population that he represents? A. It turns out that that is the case. Roughly the number of votes assigned to each legislator is approximately equal to the population which he represents.
‘ ‘ Q. Assuming that we had a districting plan for the County of Chenango, would the voting power of each legislator representing a substantially equally populated district and each having one vote, would the voting power of that legislator be comparable or substantially equal to the voting power of each legislator under a weighted voting plan as proposed here? A. The representation of the people in the legislator’s constituency *931 would "be represented — 'all facts weighed — equally as under the equal district plan.
& * &
u Q. I just have two or three final questions. In your estimation, does the plan as contained in the local "law represent a true reflection of the voting power of each of the legislators as compared to the population each represents? A. Yes, it does.
££ Q. From your experience, would you state that there would be a comparable result with respect to the voting power of each legislator if a districting plan using districts of equal population, one vote allocated to each legislator, were employed rather than a computerized weighted voting plan. A. Would the voting power of the legislator be —
££ Q. Comparable. A. —comparable. In absolute terms, it would be different, but in relative terms to his constituency, it would be —
££ Q. In proportion to the population he represents then, it would be the same ?■ A. Then it would be the same.
11 Q. And you would state, sir, that this plan represents an equitable allocation of votes in proportion to the population that each legislator represents? A. Yes, under the stated assumptions, it would be.”
On cross-examination by the Assistant Attorney-General the witness testified:
61 Q. Now, this plan which you have devised takes into account the weight and, I assume that this is the nearest weight to a perfect weighting which could be reached with any kind of certainty and with any consideration to the time and effort involved in the cost of operating a computer; is that correct? A. Yes, sir.
££ Q. In doing this, you base this on a simple majority of the total votes to be cast; is that correct? A. Yes.
“ Q. You did not take into consideration those situations which occur on the governing board of the community where a two-thirds majority is necessary, did you? A. No, I did not.
££ Q. Or where a three-fifths majority is necessary? A. No, sir.”
The total population affected is 43,243 of which 34,068 reside in 21 towns and 9,175 in the City of Norwich. Under the proposed plan the voting power of the supervisor representing wards 4, 5 and 6 in the City of Norwich, District Two, with a population of 5,147, is 228, or 11.406% of the total, 1,999, votes, while the voting power of the supervisor representing the Town of German with a population of 253 is 12 votes, or 0.600% of the total votes. The discrepancies range from a positive *932 or plus 1.438% for the Town of Columbus to a negative or minus 2.041% for the Town of Preston, indicating the overweighted votes in some towns or districts and the underweighted votes in others; the maximum deviation or discrepancy being 3.479%. Under this weighted voting plan each supervisor has voting power substantially, though not mathematically exact or precise, proportional to the population of the town or district represented ; the discrepancies are not extreme, but within permissible limits. To the extent that the matter has been presented, based on computer analysis as to a “ simple majority of the total votes to be cast”, the plan does meet the constitutional requirements, the principle of “ one man — one vote.”
In Iannucci v. Board of Supervisors of County of Washington (20 N Y 2d 244, 253 supra) the Court of Appeals pointed out that “ it was incumbent upon the boards to come forward with the requisite proof that the plans were not defective. * * * Since this was not done, the courts below correctly determined that the plans were invalid.” Stating it another way, as to the constitutionality of such a weighted voting plan a decision is impossible in the absence of a mathematical analysis and absent such an analysis the plan must be rejected. • The court in Iannucci (supra, p. 254) also noted that “ if the boards choose to reapportion themselves by the use of weighted voting, there is no alternative but to require them to come forward with such analyses and demonstrate the validity of their reapportionment plans.”
The analysis here, the proof submitted, the opinions of the expert relate solely to “ a simple majority of the total votes.” The memorandum of law submitted on behalf of the State notes, as to the testimony submitted in support of the plan:
“ The testimony applied to the use of weighted voting for simple majorities. It was not fashioned or tested for use where a two-thirds or a three-fifths majority is required under the provisions of Local Finance Law § 33.00. That section of the law relates to bond and capital note resolutions. The three-fifths majority provision is not deemed of great moment at this time and for this purpose because, where such a majority is required, a referendum can be held to determine the effectiveness of the resolution and any impropriety of assigned weights of the votes for its passage by the Board of Supervisors would thus be rectified.
‘6 However, the provisions concerning a two-thirds majority for the passage of such a resolution cannot be similarly rectified in-cases where the weights of the votes and the voting power of the supervisors do not closely approximate representation *933 of two-thirds of the population and one-third of the population.
* * * #
“ Although the County plan meets the mathematical requirements for weighted voting for the production of simple majorities, it should not be used where a two-thirds majority vote is required. The County should be required to evolve a separate standard of weights for the votes of the supervisors to be used where a two-thirds majority is required.”
The memorandum further points out, and it is not controverted :
£< [T]hat with a population of 43,243 persons and a possible 1,999 weighted votes, the representatives of 14,415 persons should be able to block any such resolution and to do so should be able to command 666 weighted votes; and that, on the other hand, the representatives of 28,829 should be able to pass any such resolution and command a total of more than 1,333 weighted votes. Certain voting combinations quickly spring to the eye, such as the following: supervisors from both city districts, plus the Town of Greene and the Town of Pharsalia and the Town of German, represent 14,567 people, which is more than one-third of the County population, yet if these supervisors were to vote against such a resolution, they could only cast 660 votes and the resolution would carry. The same combination, except for the substitution of the Town of McDonough in place of the Town of Pharsalia, results in the representation of [14,691] persons and would result in the casting of precisely 666 votes. The people represented are [277] more than one-third of the population and yet the votes their representatives will cast are just fractionally sufficient to defeat such a resolution. * * * If the same combination of representative areas is used, except that the Town of Lincklaen is substituted for the Town of Pharsalia or the Town of McDonough, people represented by the supervisors of that group total 14,416, which is just two more than one-third of the County population. However, the supervisors from this group of towns can cast only 653 votes, which are insufficient in number to defeat such a resolution.
“ It is believed that many more such examples can be found by random sampling of possible voting combinations in the County.
“Where such a resolution is required by law, it is used where major fiscal problems occur and major expense will be incurred. It may very well be that under these circumstances any such resolution could be attacked not only on the basis of lack of equal protection, but also on the basis of lack of due *934 process. Certainly, the conditions which can be produced from using the same weights for both types of majority may come dangerously close to creating an additional Constitutional problem/3
Lacking proof that the plan is not defective as it pertains to resolutions requiring a two-thirds vote of the voting strength of the hoard (see, e.g., Local Finance Law, § 33.00), should the plan be deemed unconstitutional in its entirety? Proof has been submitted that “on a simple majority of the total votes to he cast33 the plan meets the mathematical requirements, and this court concludes that the plan should be approved as to matters before the board requiring £< a simple majority of the total votes to he cast.3 3 The plan, however, in the absence of proof, should not be approved as a permanent system of apportionment for resolutions or matters requiring a two-thirds vote, nor as to any matters requiring a vote other than ££ a simple majority/3
The motion should be granted and the plan of reapportionment approved as to matters that may come before the defendant board requiring ££ a simple majority of the total votes to be cast33; the motion in other respects, as to matters that require other than ££ a simple majority 33 vote, should be denied.
The plan, having been adopted by the representative body, is approved as a temporary and interim measure as to matters that may come before that body that require other than ££ a simple majority33 vote. (See Honig v. Board of Supervisors of Renesselaer County, 31 A D 2d 989, affd. 24 N Y 2d 861.) That the legislative authority should proceed as promptly as circumstances permit to formulate a plan encompassing other than ££ a simple majority of the total votes to he cast33, a 6 £ secondary weight3 3 or plan for matters requiring a two-thirds vote, need not, in the circumstance, be further elaborated upon nor discussed.
An order should be submitted accordingly. No motion costs are awarded. The order should provide that the court retains jurisdiction for all purposes.